IN THE COURT OF COMMON PLEAS
MAHONING COUNTY, OHIO

| | | |
|---|---|---|
| ANGEL FEATHER<br>3894 Indian Run Drive Apt. 10<br>Canfield, Ohio 44406<br>     Plaintiff,<br><br>    v.<br><br>MAHONING COUNTY SHERIFF'S OFFICE<br>110 Fifth Avenue<br>Youngstown, Ohio 44503<br><br>  -and-<br><br>BOARD OF MAHONING COUNTY COMMISSIONERS<br>21 West Boardman Street<br>Youngstown, Ohio 44503<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO.<br><br>JUDGE:<br><br><br>**COMPLAINT FOR DAMAGES AND REINSTATEMENT**<br><br>**JURY DEMAND ENDORSED HEREIN** |

Plaintiff, Angel Feather, by and through undersigned counsel, as her Complaint against the Defendants, states and avers the following:

### PARTIES AND VENUE

1. Feather is a resident of the city of Youngstown, county of Mahoning, state of Ohio.

2. Mahoning County Sheriff's Office ("County Sheriff") is located in the state of Ohio.

3. County Sheriff conducts business at 110 Fifth Avenue, Youngstown, Ohio 44503.

4. All of the material events alleged in this Complaint occurred in Mahoning County.

5. Therefore, personal jurisdiction is proper over Defendants pursuant to Ohio Revised Code §2307.382(A)(1) and (3).

6. Venue is proper pursuant to Civ. R. 3(C)(1) and (3).



2021 CV 00535

7. This Court is a court of general jurisdiction over the claims presented herein, including all subject matters of this Complaint.

## FACTS

8. Feather is a former employee of County Sheriff.

9. Feather is female.

10. County Sheriff hired Feather as a Deputy Sheriff on or around November 1, 2016.

11. Feather was an employee in good standing with little to no history of discipline during her employment with County Sheriff.

12. In or around April 2016 Feather interviewed with County Sheriff (hereinafter "Feather's Interview").

13. During Feather's Interview, Feather was interviewed by eight ranking officials with the Sheriff's Office.

14. During Feather's Interview, Defendants asked Feather if she had any children.

15. During Feather's Interview, Defendants asked Feather if she was married.

16. During Feather's Interview, Defendants asked Feather if she could "handle this job".

17. Upon information and belief, County Sheriff did not ask similarly situated male employees whether they had children during their interviews.

18. Upon information and belief, County Sheriff did not ask similarly situated male employees whether they were married.

19. Upon information and belief, County Sheriff did not ask similarly situated male employees whether they could "handle this job".

20. The questions asked in Feather's Interview constituted gender discrimination.



21. A reasonable person in Feather's position would view the questions in Feather's Interview to be gender discrimination.

22. Jeff Allen was at all times hereinafter mentioned, a Major with County Sheriff.

23. Allen was at all times hereinafter mentioned, an individual who was a manager and/or supervisor at County Sheriff who acted directly or indirectly in the interest of County Sheriff.

24. Allen is a male.

25. In or around the summer of 2018, Allen asked Feather to be the bait in a sex sting operation (hereinafter "2018 Sex Sting").

26. During the 2018 Sex Sting, Allen asked Feather to pose as an underage female.

27. During the 2018 Sex Sting, Allen instructed Feather to appear at a designated location, open the door, and wave a suspected predator into a home.

28. During the 2018 Sex Sting, County Sheriff promised to pay Feather overtime for participating in the sting.

29. Before the date of the 2018 Sex Sting, Feather met with Allen and a Detective Murphy to discuss her responsibilities ("Allen Sex Sting Meeting").

30. During the Allen Sex Sting Meeting, Allen informed Feather that she had to provide promiscuous photos of herself that were to be used in the undercover process to entice suspects.

31. During the Allen Sex Sting Meeting, Detective Murphy objected stating that Feather did not have to provide such photos.

32. Allen did not request promiscuous photos from other similarly situated male employees.

33. During the Allen Sex Sting Meeting, Allen insisted that Feather provide promiscuous photos.

34. During the Allen Sex Sting Meeting, Allen told Feather that she could either take new pictures or send older pictures of herself from back when Feather was in middle school or high school.



35. During the Allen Sex Sting Meeting, Allen told Feather that he previously made two other female officers send him promiscuous pictures for past sex sting operations.

36. During the Allen Sex Sting Meeting, Allen told Feather that she should send him promiscuous photos because it was "better to be safe than sorry."

37. During the Allen Sex Sting Meeting, Allen told Feather that she should wear tight pants for the sting operation.

38. Allen did not tell other similarly situated male employees to wear tight pants for the operation.

39. During the Allen Sex Sting Meeting, Detective Murphy objected to Allen's request that Feather wear tight pants.

40. During the Allen Sex Sting Meeting, Allen told Feather that a red-headed female officer usually participated in sting operations.

41. During the Allen Sex Sting Meeting, Allen told Feather that he wanted to "share a hotel room" with the red-headed female officer.

42. When Allen stated that he wanted to "share a hotel room" with the red-headed female officer, he implied that he wanted to have sexual relations with her.

43. Allen implying that he wanted to have sexual relations with another employee constitutes sexual harassment.

44. During the Allen Sex Sting Meeting, Allen offended Feather with his comments about sending promiscuous underage photos of herself.

45. During the Allen Sex Sting Meeting, Allen offended Feather with his comments about wearing tight pants.

46. During the Allen Sex Sting Meeting, Allen offended Feather with his comments about wanting to share a hotel room with a red-headed female officer.



47. After the Allen Sex Sting Meeting, Allen's actions left Feather with no choice but to withdraw from the sex sting operation.

48. After Feather withdrew from working on the 2018 Sex Sting, she missed out opportunities to be considered for overtime sting operations.

49. Allen's actions during the 2018 Sex Sting constitute sexual harassment.

50. Feather viewed Allen's actions during the 2018 Sex Sting as sexual harassment.

51. A reasonable person in Feather's position would view Allen's actions during the 2018 Sex Sting as sexual harassment.

52. Allen's actions during the 2018 Sex Sting constitute gender discrimination.

53. Feather viewed Allen's actions during the 2018 Sex Sting as gender discrimination.

54. A reasonable person in Feather's position would view Allen's actions during the 2018 Sex Sting as sexual harassment.

55. On or around June 30, 2019, Feather was working a scheduled shift in the jail when an inmate assaulted Feather (hereinafter "June 30, 2019 Workplace Assault").

56. During the June 30, 2019 Workplace Assault, an inmate at the jail, Amaris Gordon, threw a cup filled with an unknown dark-colored chunky liquid at Feather.

57. During the June 30, 2019 Workplace Assault, the cup and liquid thrown by Gordon struck Feather in her face and body.

58. During the June 30, 2019 Workplace Assault, the cup and liquid thrown by Gordon potentially made contact with Feather's mucous membranes located in and around her mouth, nose, and eyelids.

59. During the June 30, 2019 Workplace Assault, there was an current outbreak of Hepatitis C in the cell block that Gordon was housed in.



60. After the June 30, 2019 Workplace Assault, Feather worried that the liquid thrown on her may have entered her eyes, nose, or mouth causing her to contract Hepatitis C.

61. Feather reported the June 30, 2019 Workplace Assault to her direct supervisor, Gerald D'angelo.

62. D'angelo was at all times hereinafter mentioned, a Sergeant with County Sheriff.

63. D'angelo was at all times hereinafter mentioned, an individual who was a manager and/or supervisor at County Sheriff who acted directly or indirectly in the interest of County Sheriff.

64. D'angelo took no action in response to Feather's report of the June 30, 2019 Workplace Assault.

65. Upon information and belief, County Sheriff had protocols in place for assault.

66. Upon information and belief, County Sheriff had protocols in place for exposure to bodily fluids.

67. After learning of the June 30, 2019 Workplace Assault, D'angelo did not follow the protocols for assault on an officer.

68. During Feather's Workplace Assault, D'angelo did not follow the protocols for an officer's exposure to an inmate's bodily fluids.

69. William Cappabianca was and at all times hereinafter mentioned a Major with County Sheriff.

70. Cappacianca was at all times hereinafter mentioned, an individual who was a manager and/or supervisor for County Sheriff who acted directly or indirectly in the interest of County Sheriff.

71. Cappabianca is a male.

72. On or about the second week of July 2019, Cappabianca called Feather in for a meeting to discuss the June 30, 2019 Workplace Assault with a union representative, John Tkach (hereinafter "Cappabianca and Tkach Meeting").



73. John Tkach was at all times hereinafter mentioned, a union representative for County Sheriff.

74. Tkach is a male.

75. During the Cappabianca and Tkach Meeting, Feather felt that she was being treated as if the assault was her fault.

76. Feather attempted to take a short break from the Cappabianca and Tkach Meeting.

77. Feather went into the women's locker room to use the restroom.

78. Cappabianca followed Feather out of the Cappabianca and Tkach Meeting and into the women's changing area ("Locker Room Incident").

79. Cappabianca harassed Feather by yelling at her to come out of the locker room.

80. During the Locker Room Incident, Tkach stood outside of the locker room.

81. During the Locker Room Incident, Tkach did not try to stop Cappabianca from entering the women's locker room.

82. A male supervisor entering a women's locker room to yell at a female employee is sexual harassment.

83. A male supervisor entering a women's locker room to yell at a female employee is gender discrimination.

84. Feather viewed the Locker Room Incident as sexual harassment.

85. A reasonable person in Feather's position would view the Locker Room Incident as sexual harassment.

86. Feather viewed the Locker Room Incident as gender discrimination.

87. A reasonable person in Feather's position would view the Locker Room Incident as gender discrimination.



88. After the Locker Room Incident, Country Sheriff began treating Feather less favorably than other similarly situated male employees.

89. Upon information and belief, employees at County Sheriff rely on radio communication to call for backup and report incidents.

90. D'angelo refused to respond to Feather's radio calls.

91. Refusing to respond to Feather's radio calls put her safety at risk.

92. D'angelo did not refuse to respond to the radio calls of similarly situated male employees.

93. Refusing to respond to a female subordinate's radio calls and not the calls of similarly situated male subordinates is gender discrimination.

94. Feather viewed D'angelo refusing to respond to her radio calls as gender discrimination.

95. A reasonable person in Feather's position would view D'angelo refusing to respond to her radio calls as gender discrimination.

96. Feather frequently complained to D'angelo about him refusing to respond to her radio calls.

97. Because D'angelo acted as a manager, County Sheriff became aware of Feather's complaints.

98. Upon information and belief, County Sheriff had a duty to conduct an investigation into D'angelo refusing to respond to Feather's radio calls.

99. County Sheriff failed to investigate D'angelo refusing to respond to Feather's radio calls.

100. Because of Feather's Workplace Assault, a doctor diagnosed Feather with PTSD.

101. Feather's PTSD caused severe nightmares and panic attacks even while she was at work ("Medical Condition").

102. The symptoms caused by Feather's Medical Condition substantially impaired one or more of her major life activities including working.



103. Suffering from this Medical Condition, Feather is and was considered disabled within the meaning of R.C. § 4112.01 *et seq.*

104. In the alternative, County Sheriff perceived Feather as being disabled.

105. Despite this actual or perceived disabling condition, Feather was still able to perform the essential functions of her job with or without reasonable accommodation(s).

106. Feather's doctor sent a letter to County Sheriff describing her Medical Condition.

107. As such, County Sheriff became aware of Feather's Medical Condition.

108. Upon information and belief, County Sheriff is a covered employee under the FMLA.

109. As of October of 2019, Feather worked for County Sheriff for at least 12 months.

110. As of October of 2019, Feather had at least 1,250 hours of service for County Sheriff during the previous 12 months.

111. In or around October of 2019, Feather took FMLA leave to care for her disability.

112. On or around November 8, 2019, Feather spoke with Tkach about her FMLA leave.

113. After Feather informed Tkach about her use of FMLA leave, Tkach told Feather that the Commander of the County Sheriff's office, was coming to her residence to confiscate her ID badge and gun ("Gun and Badge Confiscation").

114. During the Gun and Badge Confiscation, Feather requested the exchange be done in a neutral place as she was not told who would be arriving to confiscate her ID badge and gun.

115. During the Gun and Badge Confiscation, Feather met with an Officer Antonucci in a neutral location.

116. Antonucci was at all times hereinafter mentioned, the Commander at County Sheriff.

117. Antonucci was at all times hereinafter mentioned, an individual who was a manager and/or supervisor at County Sheriff who acted directly or indirectly in the interest of County Sheriff.



118. During the Gun and Badge Confiscation, Antonucci confiscated Feather's ID badge and gun.

119. During the Gun and Badge Confiscation, Antonucci referenced Feather's FMLA paperwork as the reason County Sheriff confiscated her ID badge and gun.

120. During the Gun and Badge Confiscation, confiscating Feather's ID badge and gun was equivalent to a suspension of her employment.

121. County Sheriff did not confiscate the ID badge and gun of similarly situated male employees who used FMLA leave.

122. During the Gun and Badge Confiscation, County Sheriff effectively suspended Feather's employment in retaliation for making complaints about gender discrimination in the office.

123. During the Gun and Badge Confiscation, County Sheriff effectively suspended Feather's employment in retaliation for taking protected FMLA leave.

124. During Feather's FMLA leave, County Sheriff sent Feather a letter stating that she would not be allowed to return from leave until she was cleared by an independent third-party doctor.

125. On or about January 18, 2020, Feather faxed FMLA release papers from her doctor to County Sheriff.

126. The release papers Feather faxed stated that her FMLA leave would be ending on January 21, 2020.

127. On or about January 24, 2020, Feather had not received clearance from an independant third-party doctor as requested by the County Sheriff.

128. On or about January 24, 2020, County Sheriff accused Feather of "No-call/No-showing" for a shift ("False No-Call/No-Show").

129. "No-call/No-showing" refers to an employee not showing up for work and failing to provide an excuse for not showing up for work.



130. It was impossible for Feather to return to work on January 24, 2020 because she had not been cleared by an independent third party doctor as requested by County Sheriff.

131. During the False No-Call/No-Show, Feather had not received her ID badge or gun from County Sheriff.

132. It was impossible for Feather to return to work on January 24, 2020 because she could not return to work without her ID badge or gun.

133. During the False No-Call/No-Show, County Sheriff forced Feather to choose between attempting to work without the proper clearance and equipment or being written up for not showing up to work.

134. Feather returned to work on February 1, 2020.

135. On or about February 2, 2020, Feather suffered a panic attack.

136. As a result of the February 2, 2020 panic attack, Feather called and let management know she would not be reporting for her shift that day.

137. After returning to work from her FMLA leave, Feather felt that she was the target of harassment by her coworkers.

138. D'angelo continued to refuse to answer Feather's radio calls.

139. County Sheriff intended to have its employees treat Feather so poorly to force her to quit.

140. Feather found her working conditions to be so unusually adverse so as to compel her to quit.

141. A reasonable person in Feather's position would her working conditions to be so unusually adverse so as to compel him or her to quit.

142. On February 6, 2020, Feather submitted her resignation notice to County Sheriff.

143. On February 6, 2020, County Sheriff constructively discharged Feather.

144. County Sheriff constructively discharged Feather due to her disability.



145. In the alternative, County Sheriff constructively discharged Feather due to a perceived disability.

146. County Sheriff constructively discharged Feather due to her gender.

147. County Sheriff constructively discharged Feather for making protected complaints.

148. County Sheriff constructively discharged Feather for utilizing FMLA leave.

149. Feather suffered emotional distress as a result of Defendants' conduct, and is entitled emotional distress damages pursuant to R.C. § 4112.01 *et seq*.

150. As a direct and proximate result of Defendants' conduct, Feather suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

## COUNT I: GENDER DISCRIMINATION

151. Feather restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

152. Feather is a member of a statutorily protected class based on her gender under R.C. § 4112.01 *et seq*.

153. Defendants treated Feather differently than other similarly situated employees based on her gender.

154. Defendants discriminated against Feather on the basis of her gender throughout her employment with the company.

155. Defendants constructively discharged Feather without just cause.

156. Defendants constructively discharged Feather based on her gender.

157. Defendants' discrimination against Feather based on her gender violates R.C. § 4112.01 *et seq*.



158. Feather suffered emotional distress as a result of Defendants' conduct, and is entitled emotional distress damages pursuant to R.C. § 4112.01 *et seq*.

159. As a direct and proximate result of Defendants' conduct, Feather suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

### COUNT III: DISABILITY DISCRIMINATION

160. Feather restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

161. Feather suffers from PTSD.

162. Feather is disabled.

163. In the alternative, Defendants perceived Feather as being disabled.

164. Feather's condition constituted a physical impairment.

165. Feather's condition substantially impaired one or more of her major life activities including working.

166. Defendants perceived Feather's condition to substantially impair one or more of her major life activities including working.

167. Defendants treated Feather differently than other similarly-situated employees based on her disabling condition.

168. Defendants treated Feather differently than other similarly-situated employees based on her perceived disabling condition.

169. On or about February 6, 2020, Defendant constructively discharged Feather's employment without just cause.

170. Defendants constructively discharged Feather based her disability.

171. Defendants constructively discharged Feather based her perceived disability.



172. Defendants violated R.C. §4112.02 when it constructively discharged Feather based on her disability.

173. Defendants violated R.C. §4112.02 when it constructively discharged Feather based on her perceived disability.

174. Defendants violated R.C. §4112.02 by discriminating against Feather based on her disabling condition.

175. Defendants violated R.C. §4112.02 by discriminating against Feather based on her perceived disabling condition.

176. Feather suffered emotional distress as a result of Defendants' conduct, and is entitled emotional distress damages pursuant to R.C. § 4112.01 *et seq*.

177. As a direct and proximate result of Defendants' conduct, Feather suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

## COUNT IV: RETALIATION IN VIOLATION OF R.C. § 4112.01 *et seq.*

178. Feather restates each and every prior paragraph of this complaint, as if it were fully restated herein.

179. As a result of the Defendant's discriminatory conduct described above, Feather complained about the sexual harassment and gender discrimination she was experiencing.

180. Defendant's actions were retaliatory in nature based on Feather's opposition to the unlawful discriminatory conduct.

181. Pursuant to R.C. §4112.02(I), it is an unlawful discriminatory practice "to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section…"



182. Feather suffered emotional distress as a result of Defendants' conduct, and is entitled emotional distress damages pursuant to R.C. § 4112.01 *et seq*.

183. As a direct and proximate result of Defendant's retaliatory discrimination against and termination of Feather, she suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

### COUNT V: SEXUAL HARASSMENT

184. Feather restates each and every paragraph of this Complaint as though it were fully restated herein.

185. Feather was subjected to unwelcomed sexual harassment in the form of sexual comments, inappropriate sexual gestures, and sexual advances.

186. Defendants created and sustained an environment of severe and pervasive sexual harassment in the form of unwelcomed sexual comments, inappropriate sexual gestures, and sexual advances.

187. Defendants' actions amount to discrimination on the basis of sex through the creation of a hostile work environment in violation of R.C. § 4112.02(A).

188. Allen's sexual harassment of Feather occurred while he was acting in the course and scope of his employment as a manager.

189. Feather's supervisors had knowledge of Allen's sexual harassment and failed to take any corrective or remedial action.

190. Feather suffered emotional distress as a result of Defendants' conduct, and is entitled emotional distress damages pursuant to R.C. § 4112.01 *et seq*.



191. As a direct and proximate result of Defendants' conduct, Feather has suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

## COUNT VI: RETALIATION IN VIOLATION OF THE FMLA

192. Feather restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

193. During her employment, Feather utilized FMLA leave.

194. After Feather utilized her qualified FMLA leave, Defendants retaliated against her.

195. Defendants retaliated against Feather by constructively discharging her employment.

196. Defendants willfully retaliated against Feather in violation of U.S.C. § 2615(a).

197. As a direct and proximate result of Defendants' wrongful conduct, Feather is entitled to all damages provided for in 29 U.S.C. § 2617, including liquidated damages, costs, and reasonable attorney's fees.

## DEMAND FOR RELIEF

WHEREFORE, Feather demands from Defendants the following:

(a) Issue an order requiring County Sheriff to restore Feather to one of the positions to which she was entitled by virtue of her application and qualifications, and expunge her personnel file of all negative documentation;

(b) An award against each Defendant of compensatory and monetary damages to compensate Feather for physical injury, physical sickness, lost wages, emotional distress, and other consequential damages, in an amount in excess of $25,000 per claim to be proven at trial;

(c) An award of punitive damages against each Defendant in an amount in excess of $25,000;



(d) An award of reasonable attorneys fees and non-taxable costs for Carr claims as allowable under law;

(e) An award of the taxable costs of this action; and

(f) An award of such other relief as this Court may deem necessary and proper.

        Respectfully submitted,

        Andrew D. Pappert (0093964)
        Brian D. Spitz (006816)
        **THE SPITZ LAW FIRM, LLC**
        25200 Chagrin Boulevard, Suite 200
        Beachwood, OH 44122
        Phone: (216) 291-4744
        Fax: (216) 291-5744
        Email: drew.pappert@spitzlawfirm.com
               Brian.spitz@spitzlawfirm.com

        *Attorney For Plaintiff Fawn Porter*



## JURY DEMAND

Plaintiff Angel Feathers demands a trial by jury by the maximum number of jurors permitted.

Andrew D.Pappert (0093964)



The Employee's Attorney.™

*2021 CV 00535*